UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

In re LG.PHILIPS LCD CO., LTD. : Civil Action No. 1:07-cv-00909-RJS
SECURITIES LITIGATION :
 : <u>CLASS ACTION</u>
—————————————————— :
 :
This Document Relates To: :
 :
  ALL ACTIONS. :
—————————————————— x

CONSOLIDATED AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs Betty O. Abrams and Justin Coren (collectively, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, make the following allegations based upon Lead Plaintiffs' individual and personal knowledge, Lead Plaintiffs' own acts, and the investigation undertaken by their undersigned counsel as to all other matters, which includes, *inter alia*, an analysis of publicly available documents published or disseminated by or on behalf of, or concerning LG.Philips LCD Co., Ltd. ("LG.Philips" or the "Company") and/or any of its competitors or peers, and any of the individual defendants named herein, including, *inter alia*, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases and other announcements, transcripts or wire broadcasts of conference calls, securities analysts' reports and advisories, and information readily available on the Internet, as well as a review of the Direct Purchaser Plaintiffs' Consolidated Complaint and the Indirect Purchaser Plaintiffs' Consolidated Complaint filed in the case captioned *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, Master File No. C07-1827 SI (N.D. Cal., filed Nov. 5, 2007), and other pleadings and orders filed in that case. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.        This is a class action on behalf of purchasers of LG.Philips' publicly traded securities, including American Depository Shares ("ADSs"), during the period from July 16, 2004 to December 11, 2006 (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), respectively, and Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.  The Company's shares are dually listed on the New York Stock Exchange ("NYSE") and the Korean Stock Exchange.

2.      LG.Philips is a corporate entity created in July 1999 as a joint venture between LG Electronics, Inc. and Koninklijke Philips Electronics N.V.  The Company engages in the manufacture and supply of thin film transistor liquid crystal display ("LCD") panels to original equipment manufacturers and multinational corporations, primarily for use in notebook computers, desktop monitors, televisions and industrial and other applications.  The Company is one of the largest suppliers of high-definition television panels to the market.

3.      During the Class Period, defendants made numerous positive statements concerning the Company's LCD business while, unbeknownst to investors, defendants were using deceptive antitrust mechanisms to artificially inflate the Company's earnings and already inflated profit margins.  For example, throughout fiscal year 2004, defendants' positive claims all shared a common theme – that LCD prices would stabilize in the near future and that, as a result, LCD product demand would show a corresponding increase.  Defendants, however, failed to mention that they themselves were causing the "stabilized" market.  Similarly, throughout fiscal year 2005, defendants continued to make positive statements about the LCD market.  But, again, defendants failed to mention they were the source of "stabilization," *i.e.*, artificially inflated prices, stating, *inter alia*, that "[w]e expect [LCD prices] will begin to stabilize in the second quarter and then show signs of strengthening later in the year."

4.      Defendants plotted their market stabilization goal in early 2004, if not before, when industry profits were peaking.  Shortly thereafter, the average profit margins in the first half of 2004 at the three largest producers, including LG.Philips, exceeded 30%.  Defendants' Class Period statements are fraught with their prophetic comments of future pricing, including public comments that were directed at the Company's co-conspirators to alert them to industry-wide changes that needed to be made concerning pricing and production.  While defendants issued these clairvoyant

statements as to LCD prices for more than two years, defendants never once admitted that they were

the very cause of ***how/why*** the prices of LCDs would move.

5.       Unbeknownst to shareholders, defendants knew that their illicit behavior, if revealed,

could result in fines exceeding $1 billion and also could result in possible jail time.  Antitrust fines

can be estimated based on either the success of the illicit venture or the harm emanating therefrom.

Combined, the Company could pay nearly a billion dollars in fines on one continent alone:

- **Penalties in Europe**: Europe can fine as much as 10% of a company's annual revenue, including sales of unrelated products.

- **Penalties in the U.S.**: the U.S. Department of Justice ("Department of Justice") can fine companies $100 million, double the offender's profits, or twice the victims' losses, whichever is largest.

- **Penalties in Japan/South Korea**: in Japan and South Korea, penalties may be as high as 10% of the related product's sales during the period of the offense.

All told, defendants knew their conduct could, and indeed likely would, result in fines far exceeding

the original profits from their anticompetitive behavior.  Furthermore, because defendants had

knowledge of the maximum fines that were assessed, these liabilities were incurred and estimable

ever since (and even before) the Company went public.

6.       Defendants also knew, but failed to disclose that:

(a)       From on or about June 2004 until on or about June 2006, LG.Philips and its

co-conspirators entered into and engaged in a combination and conspiracy in the U.S. and elsewhere

to suppress and eliminate competition by fixing the prices of LCD panel products to be sold to

resellers and consumers.  The combination and conspiracy engaged in by LG.Philips and its co-

conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation

of §1 of the Sherman Act (15 U.S.C. §1);

(b)     The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among LG.Philips and its co-conspirators, the substantial terms of which were to agree to fix the prices for LCD panel products to be sold to certain resellers and consumers;

(c)     For the purpose of forming and carrying out the charged combination and conspiracy, LG.Philips and its co-conspirators did those things that they combined and conspired to do, including, among other things:

(i)     participating in meetings, conversations and communications in the U.S. and elsewhere to discuss the prices of LCD panel products to be sold to certain resellers and consumers;

(ii)     agreeing, during those meetings, conversations and communications, to charge prices for LCD panel products at certain levels to be sold to certain resellers and consumers;

(iii)     issuing price quotations in accordance with the agreements reached;

(iv)     exchanging information on sales of LCD panel products to certain resellers for the purpose of monitoring and enforcing adherence to the agreed-upon prices and artificially inflating the Company's revenue and profits;

(d)     The Company's Class Period earnings and revenue growth, its capacity, cost competitiveness, pricing and demand for its products were the result of its participation in the price-fixing conspiracy; and

(e)     As a result of the foregoing, the Company's shares traded at inflated prices, enabling the Company to consummate its July 16, 2004 initial public offering ("IPO") raising $1 billion, its July 20, 2005 secondary offering raising $1.4 billion (the "Secondary Offering"), and

obtain an additional $500[1] million in other securities offerings on terms otherwise unobtainable ***but for*** defendants' fraudulent conduct, including the use of false and misleading prospectuses for the IPO and Secondary Offering.

7.     In or around 2004-2005, the U.S. government pursued criminal penalties and monetary sanctions, including monumental fines and prison sentences, against executives of Samsung Electronics Corp. ("Samsung"), among others, for engaging in a similar price-fixing scheme involving dynamic random access memory ("DRAM") that was sold to original equipment manufacturers.  As a result, by early 2006, the Individual Defendants began to fear that their scheme, if exposed, would cause them to share the same fate as the Samsung executives.  As such, defendants began to abandon their price-fixing activities and the scheme slowly unwound.  This change in defendants' conduct led the prices of TV panels to fall 25% to 30% in early 2006 and eroded corporate profits in fiscal year 2006 (which were previously inflated).

8.     By late Spring 2006, defendants had taken further steps to curtail the Company's involvement in the price fixing-scheme, including, *inter alia*, reducing prices of LCDs.  At the same time, rumors about the reasons for the sudden "weak pricing" in the LCD marketplace, *i.e.*, collusive price-fixing, began circulating throughout the markets.  This information entering the marketplace would eventually end any remaining ability of the Company to maintain artificially high profits via artificially inflated sale prices.

9.     By this time, defendants' halting of most of LG.Philips' involvement in price-fixing activities also rendered the Company's forecasted earnings and profit margins wholly unattainable.

---

[1]     $200 million in U.S. Dollar ("USD") denomination floating rate notes and $300 million in Korean Won ("KRW") denomination fixed rate bonds.

It also severely impacted the Individual Defendants' ability to receive bonuses, which were triggered upon the Company achieving certain financial targets. Thus, even before the Company reported its financial results for the first quarter of fiscal 2006 ("Q1 2006"), defendants knew that the Company's financial results for the second, third and fourth quarters of fiscal 2006 ("Q2 2006," "Q3 2006" and "Q4 2006," respectively), would include losses totaling in excess of half a billion dollars. Defendants also knew that ceasing LG.Philips' involvement in price-fixing activities would eviscerate nearly all the Company's profits for these quarters and would cause LG.Philips to miss its inflated earning per share forecasts. Without artificial anticompetitive mechanisms in place, the Company's near-term future was dim. So, too, was the future of the Company's share price, which began to *price in* rumors of anticompetitive behavior within the LCD industry, including within the Company. In a matter of weeks, the Company's shares declined from $22 per share to $15 per share, a decline of 31.8%. During this time, on June 12, 2006, LG.Philips announced that it was revising its Q2 2006 projections, which was then followed by a later announcement of its ***first loss in 10 quarters.***

10.      On October 10, 2006, the Company's shares tumbled again, nearly 7%, following the Company's report that its Q3 2006 profit fell 86%. Following the Company's report of disastrous Q3 2006 results, analysts and economists poured over the Company's SEC filings in search of a *candid* explanation for the Company's Q2 2006 loss and Q3 2006 drop in profits. Of course, they never found the sought-after explanation, as defendants' prior statements concealed any involvement by LG.Philips in the illicit price-fixing scheme, or that the Company's previously reported, stellar financial results were largely the result of this illicit behavior.

11.      Attempting to explain the Company's purportedly unexpected Q3 2006 loss, defendant Wirahadiraksa made the following statement in the Company's October 10, 2006 report:

"We are now at a crucial inflection point.  Without additional measures relating to product mix, cost, and productivity, we will not be able to deliver value to our shareholders.  In the coming months, ***LG.Philips LCD will take the required actions in these areas to better respond to a new reality on pricing, demand and competitive pressures***.[2]  We are confident that we have at least taken the right first steps – maintaining healthier inventory levels, reducing costs at an expedited rate in Q3, and aligning ourselves in a more substantial way with our customers – and management remains committed to do what is necessary to generate acceptable returns."

12.     Contrary to defendants' October 10, 2006 statements that the Company's purportedly unexpected Q3 2006 loss was the result of general price declines of LCD televisions, in truth, the Company's profitability fell into a steep decline in the Spring of 2006, when defendants abandoned their method of inflating the Company's profits through illegal means – *i.e.*, price-fixing – which accounted for the Company's historic profitability.  In response to the foregoing partial disclosure of, among other things, how the Company will "respond to a ***new*** reality on pricing, demand and competitive pressures," investors sold record amounts of shares, sending the Company's shares plunging 7% in one day, eroding $200 million in market capitalization alone.  And still, investors did not know the full truth.

13.     Two months later, on Friday, December 8, 2006, officials from South Korea's Fair Trade Commission ("KFTC") appeared at the Company's Seoul headquarters to proceed with a formal investigation of the Company and its top executives.  The KFTC also investigated LG.Philips' units in Tokyo and San Jose, California.  As news of the KFTC investigation began to leak, so too did the remaining steam behind the Company's shares.

14.     Then, on Monday, December 11, 2006, the Company publicly announced it was being investigated for "possible anticompetitive conduct in the LCD industry."  In fact, defendants'

---

[2]     Emphasis is added, unless otherwise noted.

anticompetitive behavior sparked investigations by the Department of Justice, the European Commission, and even regulators in Japan and Korea.[3]  That same day, Samsung, Taiwan's AU Optronics Corporation ("AU Optronics") and Chi Mei Corporation ("Chi Mei"), and Japan's Sharp Corporation ("Sharp") – all co-conspirators with LG.Philips in the LCD price-fixing scheme – also reported that they were under similar investigation by U.S. and Korean antitrust authorities.  These announcements spurred a two-day stock slide that *erased about $1.6 billion in market value from the top five producers, including LG.Philips.*

15.     Although the governmental investigations are still ongoing, numerous allegations have been made in the private antitrust action, *In re: TFT-LCD (Flat Panel) Antitrust Litigation*, Master File No. C07-1827 SI (N.D. Cal., filed Nov. 5, 2007), that further evidence that: (i) LG.Philips engaged in anticompetitive conduct during and prior to the Class Period; (ii) that defendants concealed this anticompetitive conduct from investors; and (iii) that the anticompetitive conduct accounted for the Company's inflated Class Period earnings.

16.     In fact, *the Department of Justice has intervened in the private antitrust action and filed documents under seal that have not been shared with the private antitrust plaintiffs and which resulted in a rare stay of merits discovery in that action*.  On information and belief, the documents filed under seal in the private antitrust action contain details of the Department of Justice's investigation and will establish evidence of a price-fixing conspiracy in the LCD industry that includes LG.Philips.  Significantly, the stay of merits discovery in the private antitrust action has now been extended until January 9, 2009, with respect to discovery seeking evidence of an alleged

---

[3]     The antitrust regulator for Taiwan, home to three of the world's five largest LCD makers, was monitoring developments in the investigation already launched by the U.S., Korea and EU.

conspiracy in violation of §1 of the Sherman Act involving LCD panels and finished products containing LCD panels.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

19.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts alleged herein, and the acts giving rise to defendants' motive, including the sale of the nearly $3 billion worth of Company securities, occurred in substantial part in this District.  In fact, defendant LG.Philips accessed the U.S. markets through its contacts with its New York-based investment bankers.[4]  Further, the Company directed the New York investment bankers to distribute shares from this District in connection with its IPO and Secondary Offering.

20.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

21.    By Order dated May 11, 2007, the Court appointed Betty O. Abrams and Justin Coren as Lead Plaintiffs.  Lead Plaintiffs purchased LG.Philips ADSs during the Class Period, as detailed

---

[4]    Morgan Stanley, Citigroup and UBS Investment Bank.

in their Certifications previously filed with the Court and incorporated herein by reference, and were damaged thereby.

22.     Defendant LG.Philips, now known as LG Display Co., Ltd. ("LG Display"), is headquartered in Seoul, South Korea and engages in the manufacture and supply of LCDs to original equipment manufacturers and multinational corporations.  The Company was incorporated in 1985 as LG Soft, Ltd. and changed its name to LG LCD Co., Ltd. in 1998.  It then changed its name to LG.Philips LCD Co., Ltd. in 1999.  On or about February 29, 2008, the Company changed its name to LG Display.

23.     Defendant Bon Joon Koo ("Koo") served, at all relevant times, as the Company's Joint Representative Director, Vice Chairman and Chief Executive Officer.  Koo also participated in the drafting of the Company's quarterly press releases during the Class Period, together with the Company's offering documents relating to the Company's 2004 IPO, 2004 debt offerings and the 2005 Secondary Offering.

24.     Defendant Ron H. Wirahadiraksa ("Wirahadiraksa") served, at all relevant times, as the Company's Joint Representative Director, President and Chief Financial Officer.

25.     Defendant Ki Seon Park ("Park") served, at all relevant times, as the Company's President and Chief Operations Officer.

26.     Defendant Rudy Provoost ("Provoost") served, at all relevant times, as Chairman of the Board of Directors of the Company.  Provoost also served on LG.Philips' Outside Director Nomination and Corporate Governance Committee and was Chairman of its Remuneration Committee.

27.     Defendant Hee Gook Lee ("Lee") served, at all relevant times, as a director of the Company. Lee also served on LG.Philips' Outside Director Nomination and Corporate Governance Committee, as well as its Remuneration Committee.

28.     Defendant Bong Sung Oum ("Oum") served, at all relevant times, as a director of the Company. Oum also served as Chairman of LG.Philips' Audit Committee.

29.     Defendant Bart Van Halder ("Halder") served, at all relevant times, as a director of the Company. Halder also served on LG.Philips' Audit Committee and its Outside Director Nomination and Corporate Governance Committee.

30.     Defendant Ingoo Han ("Han") served, at all relevant times, as a director of the Company. Han also served on LG.Philips' Audit Committee and was qualified as an Audit Committee Financial Expert.

31.     Defendant Doug J. Dunn ("Dunn") served, at all relevant times, as a director of the Company. Dunn also served on LG.Philips' Remuneration Committee.

32.     Defendant Dong Woo Chun ("Chun") served, at all relevant times, as a director of the Company. Chun also served on LG.Philips' Remuneration Committee and was Chairman of its Outside Director Nomination and Corporate Governance Committee.

33.     The defendants identified above in ¶¶23-32 are sometimes referred to herein as the "Individual Defendants."

34.     According to the Company's 2004 and 2005 Annual Reports, the Board of Directors, which included defendants Koo, Wirahadiraksa, Provoost, Lee, Oum, Halder, Han, Dunn and Chun, has the ultimate responsibility for the management of the Company's business affairs. The Board of Directors oversees three committees: the Audit Committee, the Outside Director Nomination and Corporate Governance Committee and the Remuneration Committee. The Audit Committee, which

was comprised of defendants Oum, Halder and Han, was responsible for reviewing annual and interim financial statements; reviewing the Company's system of controls and policies, including those covering business ethics; assessing compliance with disclosure and filing obligations; and examining improprieties or suspected improprieties.   The Outside Director Nomination and Corporate Governance Committee, which was comprised of defendants Chun, Halder, Provoost and Lee, was responsible for developing and recommending to the Board of Directors a set of corporate governance principles and overseeing the Company's policies, practices and procedures in the area of corporate governance.

35.     It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and public statements, as alleged herein, was the result of the collective actions of the Individual Defendants identified above.   The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

36.     The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of securities laws.

37.     As officers and controlling persons of a publicly-held company whose ADSs were, and are, registered with the SEC pursuant to the Exchange Act, and are traded on the NYSE and

governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

38.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of LG.Philips, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  As such, the Individual Defendants were controlling persons of LG.Philips within the meaning of §20(a) of the Exchange Act.  Further, the Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

39.     With respect to the Exchange Act claims, each of the Individual Defendants is liable as a participant in a scheme, plan and course of conduct that operated as a fraud and deceit on Class Period purchasers of the Company's securities.  Throughout the Class Period, defendants disseminated materially false and misleading statements and suppressed material adverse facts about the Company.

## BACKGROUND AND EXPLANATION OF
## DEFENDANTS' ILLEGAL ANTITRUST ACTIVITIES

40.     Throughout the Class Period, the market for LCDs grew dramatically.  Indeed, a September 28, 2006 *Reuters* article reported that "[m]anufacturers are expected to pump out 48.4 million LCDs for TVs this year alone, up 70 percent over 2005, while flat-panel sales – most of those using LCD technology – are expected to reach $88 billion this year and $100 billion in 2007."

41.     Despite the vast and increasing size of the market, the LCD industry is heavily concentrated among only five companies – LG.Philips, Samsung, Sharp, AU Optronics and Chi Mei – making any collusive conduct among these companies easily manageable.  According to a report by industry analyst iSuppli Corporation, which is cited to in the Direct Purchaser Plaintiffs' Consolidated Complaint filed in the civil antitrust action referenced above, LG.Philips had the greatest share of LCD television shipments in the first quarter of 2006 (22.3%), followed by Samsung (20%), Chi Mei (18.7%), AU Optronics (16.8%), and Sharp (13.9%).  The LCD industry also has very high barriers to entry since production costs are very high and the technology is continually changing.  Both prior to and during the Class Period, LG.Philips and its co-conspirators also had the practice of often announcing price reductions and production cuts at or around the same time as each other.  These factors provided a great incentive for LG.Philips and its co-conspirators to reduce production of LCDs and minimize supply in the marketplace in order to drive price increases.

42.     Both prior to and during the Class Period, executives of LG.Philips attended conferences with executives of other companies in the LCD industry.  At these conferences, presentations were made about controlling the "crystal cycle," the LCD industry's term for supply and demand, and networking receptions were hosted by LG.Philips, among others.  In addition to these face-to-face opportunities for executives to speak with one another and discuss steps they would take in furtherance of the price-fixing conspiracy, market research firms provided LG.Philips

and its co-conspirators with monthly data on market activity, which included data provided to these firms by LG.Philips and its co-conspirators.  Through these mechanisms, LG.Philips was able to monitor market information and signal its intentions to its co-conspirators to increase or decrease production/capacity of LCD panels in furtherance of the price-fixing scheme.

43.     During the Class Period, defendants maintained that LG.Philips was benefitting from price stabilization and increased LCD product demand.  However, beginning by at least 2004 and continuing until at least 2006, defendants engaged in a continuing agreement, understanding and conspiracy in restraint of trade to artificially raise, fix, maintain and/or stabilize prices for LCD panel makers in the U.S. and abroad in violation of §1 of the Sherman Act, 15 U.S.C. §1, and the federal securities laws, in turn.

44.     In formulating and effectuating the price-fixing arrangement, LG.Philips and its co-conspirators, *inter alia*:

(a)     Agreed to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of LCD products sold in the U.S.;

(b)     Sold LCD panel products at the agreed upon prices; and

(c)     Inflated their profit margins via the above acts, thereby artificially increasing the price of the Company's ADSs, which traded in response to the Company's reported profits per share.

45.     LG.Philips and its co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful arrangements to fix, maintain, raise and/or stabilize LCD product prices.

46.     Throughout the Class Period, defendants affirmatively and fraudulently concealed this unlawful conduct from Lead Plaintiffs and the Class.

47.     Only on or about December 12, 2006,[5] when news services announced that LG.Philips had been targeted by the Department of Justice for conspiring to fix the prices of LCD panel products, did the truth become known – *i.e.*, that LG.Philips and its co-conspirators had engaged in a successful, illegal price-fixing conspiracy with respect to LCD panel products, which they affirmatively concealed, in at least the following respects:

(a)     By meeting secretly to discuss the prices of LCD panel products sold in the U.S. and elsewhere;

(b)     By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; and

(c)     By giving false and pretextual reasons for the pricing of LCD panel products sold by them during the Class Period and by describing such pricing falsely as being the result of competitive factors and demand, rather than collusion.

## FALSE AND MISLEADING STATEMENTS MADE
## DURING THE CLASS PERIOD

48.     On July 16, 2004, the Company issued a press release entitled "LG.Philips LCD announces pricing of US$1.0 billion Initial Public Offering of 33,600,000 primary shares."  Shares were priced at $15.00 per share, with 24,960,000 shares (plus an over allotment) sold as ADSs and the balance sold as common stock in Korea.  The IPO was made pursuant to a Registration Statement filed with the SEC on Form F-1 on June 24, 2004, and amended on July 16, 2004 on Form POSAM, and a Prospectus (dated July 15, 2004) that was filed with the SEC on Form 424B4 on July

---

[5]     December 11, 2006 U.S. time.

16, 2004 (the "IPO Prospectus"). The IPO Prospectus contained numerous representations about the

Company's cost competitiveness, stating, in part:

> We believe that our technology leadership enables us to make timely investments in advanced manufacturing facilities . . . **which in turn positions us to deliver a broad and advanced product portfolio** in high volumes and **in a cost competitive manner to our customers**.

> \* \* \*

> **The advanced nature and scale of our facilities is a key driver of our cost competitiveness.**

> \* \* \*

> We plan to continue focusing on our product and manufacturing technology in order to maintain our position as an industry leader in delivering a broad and advanced product portfolio in high volumes and **in a cost competitive manner**.

The IPO Prospectus also listed a number of risks relating to the Company's industry. Those risks

were listed, in part, as follows:

> We operate in a highly competitive environment and **we may not be able to sustain our current market position**.

> \* \* \*

> Our industry is subject to **cyclical fluctuations**, including recurring periods of capacity increases, that may adversely affect our operating results.

> \* \* \*

> We may experience declines in the average selling prices of our display panels irrespective of cyclical fluctuations in the industry.

> \* \* \*

> **Our operating results fluctuate from period to period**, so you should not rely on period-to-period comparisons to predict our future performance.

49. The foregoing statements in the IPO Prospectus about the Company's cost

competitiveness and the risks that the Company faced were materially false and/or misleading

because defendants knew, but failed to disclose that:

- 17 -

(a)      From in or about June 2004 until in or about June 2006, LG.Philips and its co-conspirators entered into and engaged in a combination and conspiracy in the U.S. and elsewhere to suppress and eliminate competition by fixing the prices of LCD panel products to be sold to resellers and consumers.  The combination and conspiracy engaged in by LG.Philips and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of §1 of the Sherman Act (15 U.S.C. §1);

(b)      The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among LG.Philips and its co-conspirators, the substantial terms of which were to agree to fix the prices for LCD panel products to be sold to certain resellers and consumers;

(c)      For the purpose of forming and carrying out the charged combination and conspiracy, LG.Philips and its co-conspirators did those things that they combined and conspired to do, including, among other things:

(i)       participating in meetings, conversations and communications in the U.S. and elsewhere to discuss the prices of LCD panel products to be sold to certain resellers and consumers;

(ii)      agreeing, during those meetings, conversations, and communications, to charge prices for LCD panel products at certain levels to be sold to certain resellers and consumers;

(iii)     issuing price quotations in accordance with the agreements reached;

(iv)     exchanging information on sales of LCD panel products to certain resellers for the purpose of monitoring and enforcing adherence to the agreed-upon prices and artificially inflating the Company's revenue and profits;

- 18 -

(d)     The Company's Class Period earnings and revenue growth, its capacity, cost competitiveness, pricing and demand for its products were the result of its participation in the price-fixing conspiracy; and

(e)     As a result of the foregoing, the Company's shares traded at inflated prices, enabling the Company to raise $1 billion in its IPO, raise $1.4 billion in its Secondary Offering, and obtain an additional $500 million in other securities offerings on terms otherwise unobtainable **but for** defendants' fraudulent conduct, including the use of defective prospectuses for the IPO and Secondary Offering.

50.     On October 11, 2004, the Company issued a press release entitled, "LG.Philips LCD Reports Third Quarter Results," reporting its unaudited earnings results based on consolidated Korean Generally Accepted Accounting Principles ("GAAP") for the three-month and nine-month periods ended September 30, 2004.  The press release stated, in part:

> Sales increased by 11.5% to KRW 1,875 billion (USD 1,601 million) in the third quarter of 2004 from KRW 1,681 billion (USD 1,425 million) in the third quarter of 2003 due to increased demand.  ***Sales in the third quarter declined 19.6% compared to the second quarter of 2004 due to pricing pressure as a result of increased capacity in the industry, which stemmed in part from the easing of industry-wide shortages of materials and a build-up of inventory***.
>
> Operating income decreased by 29.5% to KRW 256 billion (USD 223 million) in the third quarter of 2004 from KRW 365 billion (USD 318 million) in the third quarter of 2003 and by 66.8% from KRW 771 billion in the second quarter of 2004.
>
> Net income decreased by 15.2% to KRW 291 billion (USD 252 million) in the third quarter of 2004 from KRW 343 billion (USD 298 million) in the third quarter of 2003.  This represents a decrease of 58.5% from KRW 701 billion (USD 609 million) in the second quarter of 2004.

Defendant Koo commented on the Company's performance, stating, in part:

> "In our first quarter as a public company, we continue to experience year-on-year revenue growth, ***as we utilized our increased capacity to generate higher sales to our global merchant customer***."

With regard to the Company's "Third Quarter Financial Review," the press release stated, in part:

Revenue increased by 11.5% to KRW 1,875 billion (USD 1,601 million) in the three-month period ended September 30, 2004, from KRW1,681 billion (USD 1,425 million) in the corresponding period in 2003. ***Increases in capacity contributed to additional unit sales of large-size panels for notebook computers, desktop monitors and TVs in the three-month period ended September 30, 2004, compared to the corresponding period in 2003. TFT LCD panels for desktop monitors accounted for 54.5% in terms of revenue***, with notebook computers accounting for 26.5%, TVs accounting for 13.5% and applications accounting for 5.4%.

Defendant Wirahadiraksa also commented on the Company's performance, stating, in part:

"***While we experienced greater than expected pricing declines during the quarter, we believe these declines should lead to increased acceptance and sales in the global TV market***. Furthermore, we believe that LG.Philips is ***well positioned to capture market share*** and to grow our customer relationships"

With regard to the Company's outlook, the press release stated, in part:

***The TFT-LCD industry should experience both unit and area growth in the fourth quarter of 2004 and during 2005.***

***LG.Philips LCD will increase its output to meet this growth and to meet its customers' needs.***

***We expect prices to further stabilize, as they currently are, in Q4 2004. Prices in the first half of 2005 are expected to remain weak for both PC computers and TVs and to improve in the second half of 2005, mainly due to growing demand for LCD TVs***.

51.     The statements in the October 11, 2004 press release highlighted above in ¶50 were materially false and/or misleading for the reasons set forth in ¶49.

52.     On January 24, 2005, the Company issued a press release entitled "LG.Philips LCD Reports Fourth Quarter 2004 Results," in which it reported its unaudited earnings results based on consolidated Korean GAAP for the three-month and full year-periods ended December 31, 2004. In the press release, LG.Philips stated, in part:

Sales in the fourth quarter of 2004 increased by 3% to KRW 1,933 billion (USD 1,867 million) from sales of KRW 1,875 billion (USD 1,811 million) in the third quarter of 2004. Sales decreased by 9% in the fourth quarter of 2004 from KRW

- 20 -

2,135 billion (USD 2,063 million) in the fourth quarter of 2003 due to decreases in panel prices. . . . Revenues for 2004 were KRW 8,328 billion (USD 8,046 million), an increase of 37% from KRW 6,098 billion (USD 5,891 million) in 2003.[6]

Operating income in the fourth quarter of 2004 decreased by 99% from KRW 256 billion (USD 247 million) in the third quarter of 2004.  Operating income decreased to KRW 2 billion (USD 1.9 million) in the fourth quarter of 2004 from KRW 552 billion (USD 533 million) in the fourth quarter of 2003.  Operating income for 2004 was KRW 1,728 billion (USD 1,669 million), an increase of 61% from KRW 1,074 billion (USD 1,038 million) in 2003.

EBITDA in the fourth quarter of 2004 decreased by 27% to KRW 412 billion (USD 398 million) from KRW 568 billion (USD 549 million) in the third quarter of 2004.  EBITDA in the fourth quarter of 2004 decreased by 51% from KRW 837 billion (USD 809 million) in the fourth quarter of 2003.  EBITDA for 2004 was KRW 2,994 billion (USD 2,892 million), an increase of 43% from KRW 2,091 billion (USD 2,020 million) in 2003.

Net income in the fourth quarter of 2004 decreased by 88% from KRW 291 billion (USD 281 million) in the third quarter of 2004.  Net income decreased to KRW 35 billion (USD 34 million) in the fourth quarter of 2004 from KRW 544 billion (USD 526 million) in the fourth quarter of 2003.  Net income for 2004 was KRW 1,655 billion (USD 1,599 million), an increase of 62% from KRW 1,019 billion (USD 984 million) in 2003.

Defendant Koo commented on the Company's performance, stating, in part:

> "***We continue making steady gains towards our goal of becoming the number one LCD company in the industry***.  In the third quarter of 2004 we began mass production at the world's largest sixth generation factory, 'P6', reaching an average capacity of 35,000 input sheets per month in the fourth quarter.  ***Our advanced technology enables us to further enhance our product offerings, strengthen our market position and fortify our strategic relationships with key customers***.  We remain committed to growing the LCD TV segment and have announced plans for our seventh generation factory, 'P7', which will enable us to meet the future product needs of our customers and capitalize on the growing global opportunity for LCD TVs."

With regard to the Company's "Fourth Quarter Financial Review," the press release stated, in part:

---

[6]     Amounts in KRW are translated into USD at the noon buying rate in effect on December 31, 2004, which was KRW 1,035.1 per USD.

Revenues decreased by 9% to KRW 1,933 billion (USD 1,867 million) in the three-month period ended December 31, 2004, from KRW 2,135 billion (USD 2,063 million) in the corresponding period in 2003 due to decreases in panel prices. The effect of the overall decrease in panel prices was offset by an increase in the volume of panels for notebook computers, desktop monitors and TVs resulting from increased production capacity, especially from P6, which commenced operations in August 2004. TFT-LCD panels for desktop monitors, notebook computers, TVs and applications accounted for 53%, 27%, 15% and 5% respectively on a revenue basis, in the fourth quarter of 2004, compared to 55%, 27%, 14% and 4% respectively on a revenue basis, in the third quarter of 2004.

Overall, LG.Philips LCD shipped a total of 771,000 square meters of net display area, a 38% sequential quarterly increase, with an average selling price per square meter of net display area of USD 2,304 in the fourth quarter of 2004.

Defendant Wirahadiraksa also commented on the Company's performance, stating, in part:

*"As we announced in December 2004, price declines in the fourth quarter were greater than we anticipated earlier in that period. Yet, despite these conditions, LG.Philips LCD continued to execute well on its plan to sustain market leadership, manufacturing efficiencies and sound financial management."*

*"Our strength and commitment to state-of-the-art manufacturing resulted in an impressive 38% increase in area shipped for the quarter, while at the same time, we were able to reduce our costs of goods sold. In 2005, we believe there will be strong growth in consumer demand for flat screen TVs, and our focus remains the same: superior execution, prudent cost-cutting measures and investing in our business to further improve our competitive position and long-term growth prospects."*

With regard to the Company's outlook, the press release stated, in part:

According to DisplaySearch, the TFT-LCD industry should experience both unit and area growth in 2005. *LG.Philips LCD plans to increase its output to meet this anticipated growth and to meet its customers' needs*.

Defendant Wirahadiraksa also commented on the Company's outlook, stating, in part:

*"We expect the industry supply/demand balance will begin to stabilize in the second quarter and then show signs of strengthening later in the year. For the first quarter of 2005, we see our area shipments increasing approximately 9% quarter-on-quarter. We expect a high single digit rate decline on the ASP per net display area shipped at the end of the first quarter of 2005 as compared to the end of the fourth quarter of 2004. As a result, we expect our EBITDA margin rate in the first quarter of 2005 to be in the range of the mid-teens."*

- 22 -

53.     The statements in the January 24, 2005 press release highlighted above in ¶52 were

materially false and/or misleading for the reasons set forth in ¶49.

54.     On April 11, 2005, the Company issued a press release entitled, "LG.Philips LCD

Reports First Quarter 2005 Results," reporting its unaudited earnings results based on consolidated

Korean GAAP for the three-month period ended March 31, 2005.  The press release stated, in part:

> Sales in the first quarter of 2005 increased by 7% to KRW 2,064 billion (USD 2,033
> million) from sales of KRW 1,933 billion (USD 1,904 million) in the fourth quarter
> of 2004. Sales decreased by 6% in the first quarter of 2005 from KRW 2,188 billion
> (USD 2,155 million) in the first quarter of 2004 due to decreases in panel prices.
> First quarter 2005 sales comparisons, from both a sequential and year-on-year
> perspective, were also impacted by the Korean Won appreciation against the US
> dollar during this period.
>
> Operating income in the first quarter of 2005 decreased to a loss of KRW 135 billion
> (USD 133 million) from a profit of KRW 2 billion (USD 2 million) in the fourth
> quarter of 2004 and from a profit of KRW 699 billion (USD 688 million) in the first
> quarter of 2004.
>
> EBITDA in the first quarter of 2005 decreased by 35% to KRW 269 billion (USD
> 265 million) from EBITDA of KRW 412 billion (USD 406 million) in the fourth
> quarter of 2004. EBITDA decreased by 72% in the first quarter of 2005 from KRW
> 976 billion (USD 961 million) in the first quarter of 2004.
>
> Net income in the first quarter of 2005 decreased to a loss of KRW 79 billion (USD
> 78 million) from a net profit of KRW 35 billion (USD 34 million) in the fourth
> quarter of 2004 and from a net profit of KRW 628 billion (USD 618 million) in the
> first quarter of 2004.

Defendant Koo commented on the Company's performance, stating, in part:

> "***Despite challenging market conditions, we continue to execute and perform in
> line with our plans***.  ***As a result of our ongoing, strong ramp-up of our sixth
> generation factory, 'P6', we grew our total net display area shipped by 24 percent
> in the first quarter sequentially***.  Our seventh generation TFT-LCD facility, 'P7',
> construction remains on track for mass production to begin in the first half of 2006.
> ***We continue to believe in the growth opportunities for the TFT-LCD industry, as
> LCDs evolve as the flat-panel of choice for HDTV content***."

With regard to the Company's "First Quarter Financial Review," the press release stated, in part:

> Revenues decreased by 6% to KRW 2,064 billion (USD 2,033 million) in the three-
> month period ended March 31, 2005, from KRW 2,188 billion (USD 2,155 million)

in the corresponding period of 2004 due to decreases in panel prices and the strong appreciation of the Korean Won. The effect of the overall decrease in panel prices was partially offset by an increase in the volume of large and wide panels for notebook computers, desktop monitors and TVs. ***The increase in volume shipments was in response to the growing market needs for large and wide flat panels, especially for large size TV panels***. TFT-LCD panels for desktop monitors, notebook computers, TVs and applications accounted for 56%, 18%, 22% and 4% respectively on a revenue basis in the first quarter of 2005, compared to 53%, 27%, 15% and 5% respectively on a revenue basis in the fourth quarter of 2004.

Overall, LG.Philips LCD shipped a total of 958,000 square meters of net display area, a 24% sequential quarterly increase, with an average selling price per square meter of net display area of USD 2,085 in the first quarter of 2005. This represents a decline in the selling price per square meter of net display area of approximately 10% compared to the average of the fourth quarter of 2004, and a decline of 9% at the end of the first quarter as compared to the end of the fourth quarter of 2004.

Defendant Wirahadiraksa also commented on the Company's performance, stating, in part:

"While the first quarter was challenging due to the strengthening of the Korean Won and a ***difficult pricing environment***, ***we did see some positive emerging trends***. During this quarter, the average LCD size increased with the adoption of large and wide LCD monitors and the growing popularity of LCD TVs. ***To meet the increase in demand, we continue to focus on effectively using our resources to serve our customers and improve operational efficiency***."

Defendant Wirahadiraksa further commented on the Company's outlook, stating, in part:

"As we have previously stated, ***we expect the industry supply/demand balance will begin to stabilize and then show signs of strengthening later in the year, mainly due to the growing demand for LCD TVs***."

The press release further discussed the Company's outlook, stating, in part:

***LG.Philips LCD expects to increase its output of net display area shipped at a double digit rate for the second quarter of 2005, compared to the first quarter of 2005, in order to meet the anticipated market growth and to satisfy customers' needs***. At the same time, ***due to market pricing conditions***, the Company expects its ASP per square meter to decline at a single digit rate at the end of the second quarter of 2005, compared to the end of the first quarter in 2005. In terms of the EBITDA margin, the Company anticipates mid to high teens for Q2 05.

55.     The statements in the April 11, 2005 press release highlighted above in ¶54 were

materially false and misleading for the reasons set forth in ¶49.

- 24 -

56.     On July 11, 2005, the Company issued a press release entitled, "LG.Philips LCD Reports Second Quarter 2005 Results," reporting its unaudited earnings results based on consolidated Korean GAAP for the three-month period ended June 30, 2005.  The press release stated, in part:

> Sales in the second quarter of 2005 increased by 12% to KRW 2,308 billion (USD 2,231 million) from sales of KRW 2,064 billion (USD 1,995 million) in the first quarter of 2005 and decreased 1% compared to KRW 2,332 billion (USD 2,254 million) in the second quarter of 2004.  ***Second quarter 2005 sales were led by increased shipments of large and wide LCD TV panels, desktop monitor panels, and notebook panels***.
>
> Operating income in the second quarter of 2005 swung to an operating profit of KRW 29 billion (USD 28 million) from a loss of KRW 135 billion (USD 130 million) in the first quarter of 2005, compared to an operating profit of KRW 771 billion (USD 745 million) in the second quarter of 2004.
>
> EBITDA in the second quarter of 2005 increased by 64% to KRW 442 billion (USD 427 million) from KRW 269 billion (USD 260 million) in the first quarter of 2005.  EBITDA in the second quarter of 2005 decreased by 57% from KRW 1,034 billion (USD 1,000 million) in the second quarter of 2004.
>
> Net income in the second quarter of 2005 swung to a profit of KRW 41 billion (USD 40 million) from a loss of KRW 79 billion (USD 76 million) in the first quarter of 2005, compared to a net profit of KRW 701 billion (USD 678 million) in the second quarter of 2004.

Defendant Koo commented on the Company's performance, stating, in part:

> **"*In this dynamically expanding industry, LG.Philips LCD continues to be the number one provider of large TFT-LCD panels,* with a large panel revenue market share of 24.2% in the second quarter according to DisplaySearch.  *In the second quarter, we were encouraged by the growth in shipments of LCD TV panels and remain committed to executing our leadership strategy*.  Furthermore, our notable accomplishments during the quarter included signing a new supply agreement with HP for TFT-LCD panels. . . ."**

With regard to the Company's "Second Quarter Financial Review," the press release stated, in part:

> Revenues in the three-month period ended June 30, 2005 decreased by 1.0% to KRW 2,308 billion (USD 2,231 million) from KRW 2,332 billion (USD 2,254 million) in the corresponding period in 2004, as increases in shipments mostly offset the effect of decreases in panel prices.  TFT-LCD panels for desktop monitors, notebook computers, TVs and "other applications" accounted for 53%, 18%, 24% and 5%,

respectively, on a revenue basis in the second quarter of 2005, compared to 56%, 18%, 22% and 4%, respectively, on a revenue basis in the first quarter of 2005.

Overall, LG.Philips LCD shipped a total of 1,096,000 square meters of net display area in the second quarter of 2005, a 14% sequential quarterly increase, with an average selling price per square meter of net display area of USD 2,062. This represents a decline in the average selling price per square meter of net display area of approximately 1.1% compared to the average of the first quarter of 2005 and an increase of 1.6% at the end of the second quarter as compared to the end of the first quarter of 2005.

Defendant Wirahadiraksa also commented on the Company's performance, stating, in part:

> "*In the second quarter we experienced increased demand for monitor and LCD TV panels . In anticipation of this demand, we continued the successful ramp-up of our P6 facility*. TV panel shipments have benefited from LCD TV sets approaching more attractive 'sweet spot' prices. *We have already taken a leading position in this segment and we expect to further strengthen our market position in the second half of 2005 as demand grows*."

Defendant Wirahadiraksa further commented on the Company's outlook, stating, in part:

> "*We expect the business environment to continue strengthening in the second half of 2005. For the third quarter of 2005, we believe our area shipments will increase by a mid teen percentage quarter-on-quarter due to continued growth in the monitor and TV segments. We expect a single digit percentage increase in our average sales price per square meter of net display area shipped at the end of the third quarter of 2005 as compared to the end of the second quarter of 2005. We continue to lead the TFT-LCD market expansion and remain well positioned with the ramp up of our P6 facility and the construction of our P7 facility*."

57.    The statements in the July 11, 2005 press release highlighted above in ¶56 were materially false and misleading for the reasons set forth in ¶49.

58.    On July 22, 2005, the Company filed a Prospectus with the SEC on Form 424B4 in connection with the Secondary Offering (the "Secondary Offering Prospectus"). The Secondary Offering Prospectus made numerous representations about the Company's cost competitiveness, stating, in part:

> We believe our technology leadership enables us to make timely investments in advanced manufacturing facilities . . . *which in turn positions us to deliver a broad and advanced product portfolio* in high volumes and *in a cost competitive manner to our customers*.

- 26 -

\*       \*       \*

> ***The advanced nature and scale of our facilities is a key driver of our cost competitiveness.***

\*       \*       \*

> We plan to continue focusing on our product and manufacturing technology in order to maintain our position as an industry leader in delivering a broad and advanced product portfolio in high volumes and ***in a cost competitive manner***.

The Secondary Prospectus also listed a number of risks relating to the Company's industry. Those risks were listed, in part:

> We operate in a highly competitive environment and ***we may not be able to sustain our current market position***.

\*       \*       \*

> Our industry is subject to ***cyclical fluctuations***, including recurring periods of capacity increases, that may adversely affect our operating results.

\*       \*       \*

> We may experience declines in the average selling prices of our display panels irrespective of cyclical fluctuations in the industry.

\*       \*       \*

> ***Our operating results fluctuate from period to period***, so you should not rely on period-to-period comparisons to predict our future performance.

59.     The statements in the Secondary Offering Prospectus highlighted above in ¶58 were materially false and misleading for the reasons set forth in ¶49.

60.     On October 11, 2005, the Company issued a press release entitled, "LG.Philips LCD Reports Third Quarter 2005 Results," reporting its unaudited earnings results based on consolidated Korean GAAP for the three-month period ended September 30, 2005. The press release stated, in part:

> Sales in the third quarter of 2005 increased by 19% to KRW 2,741 billion (USD 2,630 million) from sales of KRW 2,308 billion (USD 2,214 million) in the second quarter of 2005 and increased 46% compared to KRW 1,875 billion (USD 1,799

million) in the third quarter of 2004.  ***Third quarter 2005 sales were led by the growing demand for large and wide LCD TV panels and a stronger pricing environment for notebook panels***.[7]

Operating profit in the third quarter of 2005 increased to KRW 240 billion (USD 230 million) from KRW 29 billion (USD 28 million) in the second quarter of 2005, and compared to an operating profit of KRW 256 billion (USD 246 million) in the third quarter of 2004.

EBITDA in the third quarter of 2005 increased by 54% to KRW 681 billion (USD 653 million) from KRW 442 billion (USD 424 million) in the second quarter of 2005.  EBITDA increased by 20% from KRW 568 billion (USD 545 million) in the third quarter of 2004.

Net income in the third quarter of 2005 increased to a net profit of KRW 227 billion (USD 218 million) from KRW 41 billion (USD 39 million) in the second quarter of 2005, and compared to a net profit of KRW 291 billion (USD 279 million) in the third quarter of 2004.

Defendant Koo commented on the Company's performance, stating, in part:

"During the third quarter, we further enhanced our product portfolio, consistently reduced our square meter costs and ***continued on our path of market leadership.  As we predicted, large and wide LCD TVs are becoming mainstream, and we are driving this growth through our cutting-edge products, manufacturing excellence and innovative partnerships***.  Notably, our strategic investment in a new module plant in Poland, announced during the third quarter, will enable us to better serve the fast-growing European LCD TV market while strengthening relationships with our customers there."

With regard to the Company's "Third Quarter Financial Review," the press release also stated, in part:

Revenue in the three-month period ended September 30, 2005 increased by 46% to KRW 2,741 billion (USD 2,630 million) from KRW 1,875 billion (USD 1,799 million) in the corresponding period in 2004, ***as increases in shipments were robust due to growing TV demand and a stabilizing pricing environment***.  TFT-LCD panels for desktop monitors, TVs, notebook computers and "other applications" accounted for 45%, 29%, 22% and 4%, respectively, on a revenue basis in the third

---

[7]     Amounts in KRW are translated into USD at the noon buying rate in effect on September 30, 2005, which was KRW 1,042.4 per USD.

quarter of 2005, compared to 53%, 24%, 18% and 5%, respectively, on a revenue basis in the second quarter of 2005.

Overall, the Company shipped a total of 1,248,000 square meters of net display area in the third quarter of 2005, a 13.9% sequential quarterly increase, with an average selling price per square meter of net display area of USD 2,121.  This represents an increase in the average selling price per square meter of net display area of approximately 2.9% compared to the average of the second quarter of 2005, and an increase of 2.3% at the end of the third quarter as compared to the send of the second quarter of 2005.

Defendant Wirahadirsksa also commented on the Company's performance, stating, in part:

"*In the third quarter, we experienced increased demand, especially in the LCD TV and notebook panel segments, and, as a result, we shipped a record amount of display area, despite a strong competitive environment.  We were able to meet this demand growth due in large part to the successful ramp up of our P6 facility, which achieved its initial design capacity of 90,000 sheets per month this quarter. While we continued to increase capacity, we were also intensely focused on cost reduction, which continued to show improvement*."

Defendant Wirahadirsksa further commented on the Company's outlook, stating, in part:

"*For the fourth quarter of 2005, we anticipate our area shipments will increase by a low teens percentage quarter-on-quarter due to continued growth, especially in the rapidly expanding TV segment.  We expect our average selling price per square meter of net display area shipped at the end of the fourth quarter of 2005 to be flat to slightly down, as compared to the end of the third quarter of 2005, largely due to potentially weaker pricing for some monitors.  Our EBITDA margin for the fourth quarter is expected to be in the mid-to-high twenties*."

61.     The statements in the October 11, 2005 press release highlighted above in ¶60 were materially false and misleading for the reasons set forth in ¶49.

62.     On November 14, 2005, LG.Philips issued a press release announcing that it had begun to order equipment necessary for the second phase of mass production at P7, its seventh generation plant in Korea.  The November 14, 2005 press release stated, in part, that "[t]he Company decided to order equipment for the second phase of mass production at P7 *due to the rapid growth in the LCD TV market and to meet the needs of its global customer base*."

63.     The statements in the November 14, 2005 press release highlighted above in ¶62 were materially false and/or misleading because defendants failed to disclose that they were controlling prices, demand and production capacity in the LCD market as part of their price-fixing scheme.

64.     On January 12, 2006, the Company issued a press release entitled "LG.Philips LCD Reports Fourth Quarter 2005 Results," reporting its unaudited earnings results based on consolidated Korean GAAP for the three-month period ended December 31, 2005.  The press release stated, in part:

> Sales in the fourth quarter of 2005 increased by 8% to KRW 2,963 billion (USD 2,934 million) from sales of KRW 2,741 billion (USD 2,714 million) in the third quarter of 2005 and increased 53% compared to KRW 1,933 billion (USD 1,914 million) in the fourth quarter of 2004.  ***Fourth quarter sales were led by the continued growth in demand for large and wide LCD TV and notebook panels***, ***which softened the impact of a challenging monitor demand environment***.[8]

> Operating profit in the fourth quarter of 2005 increased to KRW 334 billion (USD 331 million) from KRW 240 billion (USD 238 million) in the third quarter of 2005, and compared to an operating profit of KRW 2 billion (USD 2 million) in the fourth quarter of 2004.

> EBITDA in the fourth quarter of 2005 increased by 21% to KRW 824 billion (USD 816 million) from KRW 681 billion (USD 674 million) in the third quarter of 2005.  EBITDA also increased, by 100% from KRW 412 billion (USD 408 million) in the fourth quarter of 2004.

> Net income in the fourth quarter of 2005 increased to a net profit of KRW 328 billion (USD 325 million) from KRW 227 billion (USD 225 million) in the third quarter of 2005, and compared to a net profit of KRW 35 billion (USD 34.6 million) in the fourth quarter of 2004.

Defendant Koo commented on the Company's performance, stating, in part:

> "***During the fourth quarter, LCD TV panel demand was strong as consumers are rapidly recognizing LCD technology as 'the' flat TV technology of choice***.  In 2005, LG.Philips LCD was the number one producer of large-area TFT-LCD panels

---

[8]     Amounts of KRW are translated into USD at the noon buying rate in effect on December 30, 2005, which was KRW 1,010.00 per USD.

according to DisplaySearch, and in fact, we became the first company in the LCD industry to cumulatively sell more than 10 million, 15" and above, LCD TV panel units. ***With the strong holiday selling season, we have entered an era of healthy HDTV set demand growth, well-timed with the January ramp up of our Gen. 7 fab, 'P7.' Thus, we are well positioned to retain our leadership role in this dynamic industry***."

With regard to the Company's "Fourth Quarter Financial Review," the press release stated, in part:

> Revenue in the three-month period ended December 31, 2005 increased by 53% to KRW 2,963 billion (USD 2,934 million) from KRW 1,933 billion (USD 1,914 million) in the corresponding period in 2004, due to continued growth in TV and notebook sales. TFT-LCD panels for desktop monitors, TVs, notebook computers and "other applications" accounted for 38%, 34%, 24% and 4%, respectively, on a revenue basis in the fourth quarter of 2005, compared to 45%, 29%, 22% and 4%, respectively, on a revenue basis in the third quarter of 2005.

> Overall, the Company shipped a total of 1,343,000 square meters of net display area in the fourth quarter of 2005, a 7.6% sequential quarterly increase, with an average selling price per square meter of net display area of USD 2,112. This represents a decrease in the average selling price per square meter of net display area of approximately 0.5% compared to the average of the third quarter of 2005, and a decrease of 4.1% at the end of the fourth quarter as compared to the end of the third quarter of 2005.

Defendant Wirahadiraksa also commented on the Company's performance, stating, in part:

> "***Our financial performance in the fourth quarter reflects the consistent approach we have taken to managing our business. We continue to enjoy unit and area demand growth, especially in the LCD TV and notebook panel segments, and are leveraging our extensive portfolio of production facilities to meet the dynamic needs of our customers. We are committed to providing the market with innovative and top quality TFT-LCD panels. Our shipment growth this quarter was slightly lower than expected due to a production shift in our existing facilities to support our strategy of growing the demand of large size TVs, particularly 42" panels, in advance of the P7 ramp-up. This facilitated our sooner than expected P7 ramp up in the first week of January 2006. We anticipate sequential shipment growth in the first quarter of 2006, despite historical industry seasonality***."

Defendant Wirahadiraksa further commented on the Company's outlook, stating, in part:

> "***We are looking forward to 2006, as the recent start of mass production of our P7 facility***, which is optimized for large and wide 42" and 47" LCD TV panels, ***reinforces our already strong position in the TFT-LCD industry. We also see an exciting growth opportunity for LG.Philips LCD in notebooks, particularly for the large and wide product segments***. We have a leadership position in this segment and expect to maintain and grow this lead in the future."

- 31 -

"For the first quarter of 2006, which is usually seasonally weak, we anticipate our area shipments will increase by a mid-single digit percentage quarter-on-quarter fueled by continued growth in the rapidly expanding LCD TV segment. *We expect our average selling price per square meter of net display area shipped at the end of the first quarter of 2006 to decrease by a mid-single digit percentage, as compared to the end of the fourth quarter of 2005, largely due to weaker pricing for the monitor and notebook segments. Our EBITDA margin for the first quarter is expected to be a high teens percentage.*"

65.     The statements in the January 12, 2006 press release highlighted above in ¶64 were materially false and/or misleading for the reasons set forth in ¶49.

66.     By late Spring 2006, defendants had begun to unwind the Company's involvement in the LCD price-fixing scheme as executives became increasingly unnerved by news of fines and even jail sentences imposed for price-fixing in the DRAM industry.  At the same time that defendants began ceasing their illicit behavior, rumors that price collusion was the cause of the sudden "weak pricing" in the LCD marketplace circulated throughout the markets.  This information entering the marketplace would eventually end the Company's ability to maintain artificially high profits via artificially inflated selling prices.

67.     On March 21, 2006, LG.Philips issued a press release updating its first quarter business outlook for 2006.  The press release stated, in part:

> For the first quarter of 2006, LG.Philips LCD's area shipments are expected to decline slightly compared to the fourth quarter of 2005, a change from previous guidance of a mid-single digit percentage increase. The panel price per square meter of glass at the end of the first quarter of 2006 versus the end of the fourth quarter of 2005 is expected to decrease by a high single digit percentage, slightly greater than the Company's previous guidance of a mid-single digit percentage decline. The Company's EBITDA margin percentage is not expected to be in the mid-twenties, an improvement over the previous guidance of a high teen's percentage.

Defendant Wirahadiraksa commented on the Company's expected performance, stating, in part:

> "During the first quarter of 2006, *the industry is witnessing a faster than expected ASP decline in all product segments*.  Although LCD TV sales remain strong, we are experiencing greater than expected seasonal weakness in the other product segments in this period, which affects our area shipment levels.  Despite these

factors, we were able to generate a better than expected cost down in our fabs.  In fact, given the strong performance of our newest fab, P7, we now anticipate reporting a better EBITDA performance for the first quarter of 2006.  We are particularly pleased with this, given the quarter's weaker pricing environment."

68.     The statements in the March 21, 2006 press release highlighted above in ¶67 were materially false and/or misleading because defendants failed to disclose that they were controlling prices, demand and production capacity in the LCD market as part of their price-fixing scheme.

69.     On April 11, 2006, the Company issued a press release entitled, "LG.Philips LCD Reports First Quarter 2006 Results," reporting its unaudited earnings results based on consolidated Korean GAAP for the three month period ended March 31, 2006.  The press release stated, in part:

Sales in the first quarter of 2006 decreased by 17% to KRW 2,471 billion (USD 2,544 million) from sales of KRW 2,963 billion (USD 3,050 million) in the fourth quarter of 2005 and increased 20% compared to KRW 2,064 billion (USD 2,125 million) in the first quarter of 2005.  ***The sequential decline in sales in this year's first quarter was the result of a greater than expected decline in demand and the average selling price in both the notebook and monitor panel segments***.

Operating profit in the first quarter of 2006 decreased to KRW 52 billion (USD 54 million) from KRW 334 billion (USD 344 million) in the fourth quarter of 2005, and increased compared to an operating loss of KRW 135 billion (USD 139 million) in the first quarter of 2005.

EBITDA in the first quarter of 2006 decreased by 19% to KRW 670 billion (USD 690 million) from KRW 824 billion (USD 848 million) in the fourth quarter of 2005.  EBITDA increased by 149% from KRW 269 billion (USD 277 million) in the first quarter of 2005.

Net income in the first quarter of 2006 decreased to KRW 48 billion (USD 49 million) from KRW 328 billion (USD 338 million) in the fourth quarter of 2005, and increased compared to a loss of KRW 79 billion (USD 81 million) in the first quarter of 2005.

Defendant Koo commented on the Company's performance, stating, in part:

"We began 2006 with the ramp up of P7, the world's largest 7th generation facility.  P7 will further strengthen our position in the TFT-LCD market, especially in the large panel LCD TV segment.  P7 is optimized for the production of 42- and 47-inch LCD TV panels in full HD, ***where we are driving increased market demand***."

- 33 -

"P7 adds to our scale and capacity advantage, which is key to expanding our product offering.  This allows us to meet the needs of our customers, particularly in the *fast-growing LCD TV segment*."

With regard to the Company's "First Quarter Financial Review," the press release stated, in part:

Revenue in the three-month period ended March 31, 2006 increased by 20% to KRW 2,471 billion (USD 2,544 million) from KRW 2,064 billion (USD 2,125 million) in the corresponding period in 2005, *mainly due to increased demand for LCD TVs*. TFT-LCD panels for TVs, desktop monitors, notebook computers and other applications accounted for 45%, 30%, 20% and 5%, respectively, on a revenue basis, in the first quarter of 2006, compared to 34%, 38%, 24% and 4%, respectively, on a revenue basis, in the fourth quarter of 2005.

Overall, the Company shipped a total of 1,274,000 square meters of net display area in the first quarter of 2006, a 5% sequential quarterly decrease, with an average selling price per square meter of USD 1,953. This represents a decrease in the average selling price per square meter of net display area of approximately 10% compared to the end of the fourth quarter of 2005 and an average decrease of 8% from the fourth quarter of 2005.

Defendant Wirahadiraksa also commented on the Company's performance, stating, in part:

"*We continue to focus on profitability.  Our EBITDA margin was better than expected, boosted by the operational efficiencies from the launch of P7.   We believe that our launch of P7 earlier in the year was well timed to take advantage of the growing LCD TV market, particularly in light of the seasonal weakness in notebook and monitor panels*."

"*An important element in our strategy to drive growth is our commitment to cost reduction, which includes process innovation and raw material cost reduction efforts*."

Defendant Wirahadiraksa further commented on the Company's outlook, stating, in part:

"*For the second quarter of 2006, we anticipate that our area shipments will increase quarter-on-quarter by a mid-to-high twenties percentage, driven by continued growth in the expanding LCD TV segment and progress at our P7 facility. We expect our average selling price per square meter of net display area shipped at the end of the second quarter of 2006 to decrease by a mid-to-high single digit percentage, as compared to the end of the first quarter of 2006, largely due to continued weakness in monitor and notebook pricing.  Our EBITDA margin for the second quarter is expected to be approximately 20%*."

70.     The statements in the April 11, 2006 press release highlighted above in ¶69 were

materially false and misleading for the reasons set forth in ¶49.

- 34 -

71.     By this time, defendants had already halted most, *if not all*, of their price-fixing activities, which had allowed the Company to reap unearned earnings and post inflated profit margins, while at the same time providing the Individual Defendants with bonuses triggered upon falsely meeting financial metrics that otherwise were unattainable given then-existing market conditions.  Thus, even before Q1 2006 results were reported, defendants knew that Q2, Q3 and Q4 2006 results would include losses totaling in excess of half a billion dollars.  Defendants also knew that the cessation of LG.Philips' involvement in price-fixing activities would eviscerate nearly all the Company's profits for these quarters and would cause LG.Philips to miss its inflated EPS projections.  Without the artificial anticompetitive mechanisms in place, the Company's near-term financial prospects were dim.  So, too, was the future of the Company's share price, which began to *price in* rumors of anticompetitive behavior within the LCD industry, including within the Company.  In a matter of weeks, the Company's shares declined from $22 per share to $15 per share, a decline of 31.8%.

72.     On June 12, 2006, LG.Philips issued a press release updating its outlook for the second quarter of 2006.  The press release stated, in part:

> LG.Philips LCD's area shipments are expected to increase by a mid-teen percentage quarter-on-quarter, a decline from the previous guidance of a mid-to-high twenties percentage increase.
>
> LCD TV shipment growth at the end of the second quarter is expected to be approximately 25% quarter-on-quarter, approximately 50% less than previously announced expectations.
>
> The average selling price per square meter of glass at the end of the second quarter of 2006 is anticipated to decline by a mid-teen percentage quarter-end on quarter-end, compared to a mid-to-high single digit decrease guided previously.
>
> The Company's EBITDA margin is now expected to be around 10%, a decrease from the previous guidance of approximately 20%

Defendant Wirahadiraksa commented on the Company's outlook, stating, in part:

"*Several factors affected the global LCD industry during the second quarter.  First, the industry experienced larger than expected price declines across all product categories*.  In addition, while mid-to-long term demand for flat screen panels remains strong, we saw weaker seasonal demand during the second quarter, which has increased our inventory to about four weeks, a higher level than anticipated.  *Given these factors, we have decided to temporize production to address inventory concerns and better balance our short term supply with demand.  Furthermore, we are reviewing our total capacity plans for the year and beyond*."

73.    The statements in the June 12, 2006 press release identified in ¶72 were materially false and/or misleading because defendants failed to disclose that they were controlling prices, demand and production capacity in the LCD market as part of their price-fixing scheme.  Moreover, the statements by defendant Wirahadiraksa about the Company's capacity plans for 2006 were signals to LG.Philips' co-conspirators to limit future production, thereby causing LCD prices for the available supply to increase.  Indeed, following these statements, other LCD companies, including AU Optronics, HannStar and Chi Mei, announced their own plans to cut back on production.

74.    On July 11, 2006, the Company issued a press release entitled, "LG.Philips LCD Reports Second Quarter 2006 Results," reporting its unaudited earnings results based on consolidated Korean GAAP for the three month period ended June 30, 2006.  The press release stated, in part:

Sales in the second quarter of 2006 decreased by 6% to KRW 2,315 billion (USD 2,441 million) from sales of KRW 2,471 billion (USD 2,605 million) in the first quarter of 2006 and increased 0.3% compared to KRW 2,308 billion (USD 2,433 million) in the second quarter of 2005.  *The sequential decline in sales was the result of an industry-wide decline in average selling prices across the TV, monitor and notebook segments, as well as less than expected sales volume growth and overcapacity*.[9]

Operating loss in the second quarter of 2006 was KRW 372 billion (USD 392 million) compared to an operating profit of KRW 52 billion (USD 55 million) in the

---

[9]    Amounts in KRW are translated into USD at the noon buying rate in effect on June 30, 2006, which was KRW 948.5 per USD.

first quarter of 2006, and an operating profit of KRW 29 billion (USD 31 million) in the second quarter of 2005.

EBITDA in the second quarter of 2006 was KRW 243 billion (USD 256 million), a decrease from KRW 670 billion (USD 706 million) in the first quarter of 2006 and a year-over-year decline of 45% from KRW 442 billion (USD 466 million) in the second quarter of 2005.

Net income in the second quarter of 2006 was a loss of KRW 322 billion (USD 339 million) compared to a profit of KRW 48 billion (USD 51 million) in the first quarter of 2006 and a profit of KRW 41 billion (USD 43 million) in the second quarter of 2005.

Defendant Koo commented on the Company's performance, stating, in part:

> "***The second quarter was a difficult quarter for the Company, as we were significantly impacted by much greater than expected industry-wide pricing weakness. As we look closely at our business and the long-term growth prospects for the TFT-LCD industry, we remain committed to building sustainable value for shareholders and customers by balancing long-term growth strategies with shorter-term actions designed to maximize operating profits.***"

> "***The decision to continue evaluating any further investment in a next generation and invest in a multi-purpose Gen 5.5 facility, which will be housed in our P8 facility, demonstrates our resolve to both adapt to changing market conditions and to make timely investments to meet our customers' forthcoming needs, particularly in the expanding wide format notebook and high-end monitor segments.***"

With regard to the Company's "Second Quarter Financial Review," the press release stated, in part:

> Revenue in the three-month period ended June 30, 2006, increased by 0.3% to KRW 2,315 billion (USD 2,441 million) from KRW 2,308 billion (USD 2,433 million) in the corresponding period of 2005. TFT-LCD panels for TVs, desktop monitors, notebook computers and other applications accounted for 48%, 26%, 21% and 5%, respectively, on a revenue basis, in the second quarter of 2006, compared to 45%, 30%, 20% and 5%, respectively, in the first quarter of 2006.

> Overall, the Company shipped a total of 1.5 million square meters of net display area in the second quarter of 2006, a 17% increase quarter-on-quarter, with an average selling price per square meter of USD 1,598. This represents a decrease in the average selling price per square meter of net display area of approximately 19% compared to the end of the first quarter of 2006 and an average decrease of 18% from the first quarter of 2006.

Defendant Wirahadiraksa also commented on the Company's performance, stating, in part:

"*We are disappointed with our financial performance in the second quarter of 2006. As a result, the Company is now taking initiatives to address the issues that are affecting our business. As we announced in June, we are addressing an increase in inventory levels during a period of overcapacity, primarily in the LCD TV segment, by temporizing production. We will continue to control inventory levels going forward.*"

"*We believe that the temporization of production, along with other efforts, will enable us to maintain our competitiveness as a top-tier player in an industry that is starting to take a more rational approach to capacity and has undiminished long-term growth prospects. While some of the measures are immediate, we generally expect they will strengthen our shareholders' long–term value and will enable us to leverage the industry's strong growth opportunities as we closely examine all areas of our manufacturing, capital expenditures, customer relations and expense management. We are confident that LG.Philips LCD's business results and prospects will improve over the course of 2006.*"

Defendant Wirahadiraksa further commented on the Company's outlook, stating, in part:

"*Looking ahead, we expect to see prices begin to stabilize, and anticipate sustained growth in consumer demand for LCD TVs, in the second half of 2006, particularly in the fourth quarter. For the third quarter of 2006, we expect our area shipments to increase quarter-on-quarter by a mid-to-high twenties percentage, driven by continued growth in the expanding LCD TV segment, continued ramp up at our P7 facility, and the stabilization of pricing. We expect our average selling price per square meter of net display area shipped at the end of the third quarter of 2006 to be relatively flat, as compared to the end of the second quarter of 2006, largely due to increased seasonal demand leading into the holiday season. We expect the average ASP per square meter in the third quarter to decrease by a mid-single digit percentage. Our EBITDA margin for the third quarter is anticipated to be in the low teens range.*"

75.     The statements in the July 11, 2006 press release highlighted above in ¶74 were materially false and/or misleading for the reasons set forth in ¶49.

76.     On October 10, 2006, the Company issued a press release entitled "LG Philips LCD Reports Third Quarter 2006 Results," reporting its unaudited earnings results based on consolidated Korean GAAP for the three month period ended September 30, 2006. The press release reported the Company's *first loss in 10 quarters*, despite previously posting continuous profits, and stated that profits for Q3 2006 fell 86%. The press release further stated, in part:

Sales in the third quarter of 2006 increased by 20% to KRW 2,773 billion (USD 2,931 million) from sales of KRW 2,315 billion (USD 2,446 million) in the second quarter of 2006 and increased 1% compared to KRW 2,741 billion (USD 2,897 million) in the third quarter of 2005. *The sequential rise in sales was the result of increased seasonal demand across all segments and improving market conditions, especially in the monitor and notebook segments*.

Operating loss in the third quarter of 2006 was KRW 382 billion (USD 404 million) compared to an operating loss of KRW 372 billion (USD 393 million) in the second quarter of 2006, and an operating profit of KRW 240 billion (USD 254 million) in the third quarter of 2005.

EBITDA in the third quarter of 2006 was KRW 295 billion (USE 312 million), an increase from KRW 243 billion (USD 257 million) in the second quarter of 2006 and a year-over-year decline of 57% from KRW 681 billion (USD 720 million) in the third quarter of 2005.

Net income in the third quarter of 2006 was a loss of KRW 321 billion (USD 339 million) compared to a loss of KRW 322 billion (USD 340 million) in the second quarter of 2006 and a profit of KRW 227 billion (USD 240 million) in the third quarter of 2005.

Defendant Koo commented on the Company's performance, stating, in part:

"*During the third quarter, our business did not perform at the level we expected, primarily due to higher than anticipated price declines mainly for LCD TVs. As such, the Company continues to take the necessary steps to correct the issues that have limited our progress in recent quarters. Our ability to effectively reduce costs and improve efficiencies will be crucial in restoring profitability as we prepare for what we believe will be a difficult first half of 2007*."

With regard to the Company's "Third Quarter Financial Review," the press release stated, in part:

Revenue in the three-month period ended September 30, 2006, increased by 1% to KRW 2,773 billion (USD 2,931 million) from KRW 2,741 billion (USD 2,897 million) in the corresponding period of 2005. TFT-LCD panels for TVs, desktop monitors, notebook computers and other applications accounted for 48%, 26%, 21% and 5%, respectively, on a revenue basis in the third quarter of 2006, the same level as the second quarter.

Overall, the Company shipped a total of 2 million square meters of net display area in the third quarter of 2006, a 34% increase quarter-on-quarter, with an average selling price per square meter of USD 1,430. This represents a decrease in the average selling price per square meter of net display area of approximately 3% compared to the end of the second quarter of 2006 and an average decrease of 11% from the second quarter of 2006.

- 39 -

Defendant Wirahadiraksa further commented on the Company's performance, stating, in part:

> "We are now at a crucial inflection point.  Without additional measures relating to product mix, cost, and productivity, we will not be able to deliver value to our shareholders.  In the coming months, ***LG.Philips LCD will take the required actions in these areas to better respond to a new reality on pricing, demand and competitive pressures***. We are confident that we have at least taken the right first steps – maintaining healthier inventory levels, reducing costs at an expedited rate in Q3, and aligning ourselves in a more substantial way with our customers – and management remains committed to do what is necessary to generate acceptable returns."

77.     The statements in the October 10, 2006 press release highlighted above in ¶76 were materially false and misleading for the reasons set forth in ¶49.

78.     Contrary to the October 10, 2006 disclosure that there was a "new reality on pricing, demand and competitive pressures" emerging in the marketplace, in truth, the Company's profitability fell into a steep decline after defendants began to abandon their method of inflating the Company's profits through illegal means – *i.e.*, price fixing – which accounted for the Company's historic profitability.

79.     Indeed, despite defendants' reassurances that the Company had "taken the right first steps – maintaining healthier inventory levels, reducing costs at an expedited rate in Q3, and aligning [LG.Philips] in a more substantial way with [its] customers" to "respond to [this] *new* reality on pricing, demand and competitive pressures," the Company's shares plunged during the next two days, eroding more than $200 million in market capitalization alone.

80.     Specifically, the price of LG.Philips ADSs fell $1.13 per ADS from its closing price of $16.25 on October 9, 2008, to close at $15.12 on October 10, 2006.

### THE FULL TRUTH IS REVEALED

81.     On December 8, 2006, officials from KFTC raided the Company's Seoul headquarters.  The KFTC also investigated LG.Philips' units in Tokyo and San Jose, California. Rumors of the investigation leaked, pushing shares into a multi-day decline.

82.     On December 11, 2006 (the following Monday), LG.Philips issued a press release formally announcing that it was being investigated for "possible anticompetitive conduct in the LCD industry."  Specifically, the press release reported, in part:

> Last Friday, as part of an investigation of possible anticompetitive conduct in the LCD industry, officials from the Korean Fair Trade Commission (KFTC) visited the offices of LG.Philips LCD in Seoul, Korea.  In addition, the Japanese Fair Trade Commission (JFTC) issued a notice to our offices in Tokyo, Japan and the United States Department of Justice (DOJ) issued a subpoena to our offices in San Jose, California.

83.     The clear import of this statement, and the message the market understood, was that the Company's strong performance over the past several years was not the result of its unique abilities, but rather its deceptive scheme and course of conduct to fix prices and control industry supply and demand.

84.     *This announcement spurred a two-day stock slide that erased about $1.6 billion in market value from the Company and its top competitors.*  Specifically, the price of LG.Philips ADSs fell 5.76%, from a close of $14.92 per ADS on December 8, 2006 to a close of $14.06 per ADS on December 12, 2006, on extraordinarily high volume of millions of shares traded.  The closing price on December 12, 2006 also represented a 47% decline from the Class Period high of LG.Philips ADSs of $26.60 reached on June 7, 2005.

## DEFENDANTS' MISLEADING FINANCIAL
## REPORTING DURING THE CLASS PERIOD

85.     In order to inflate the price of LG.Philips ADSs, defendants caused the Company to falsely report its financial results during at least fiscal 2004-2006 through its illegal and collusive dealings with other companies, in violation of U.S. law.

86.     The Company's fiscal 2004-2006 results were included in Form 6-Ks/20-Fs it filed with the SEC during the Class Period.  The results were also included in press releases LG.Philips issued during the Class Period.

87.     LG.Philips' 2004-2006 financial statements were materially false and/or misleading because, *inter alia*, they reported inflated revenues, earnings, and income as a result of defendants' scheme to artificially inflate prices during the Class Period.  As such, the 2004-2006 financial statements did not fairly present LG.Philips' financial results in accordance with, and in violation of, GAAP and SEC rules.

88.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

89.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

- 42 -

(a)      The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)      The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)      The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)      The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)      The principle that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79);

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97); and

(i)     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## LOSS CAUSATION/ECONOMIC LOSS

90.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of LG.Philips securities and operated as a fraud or deceit on Class Period purchasers of LG.Philips securities by misrepresenting to and concealing material information from the public about: (1) LCD panel prices; (2) market demand for LCD products; (3) LG.Philips' production capacity; (4) defendants' participation in anticompetitive conduct to fix LCD prices at artificially inflated levels; and (5) government investigations regarding LG.Philips' involvement in such anticompetitive conduct.

91.     These misstatements and omissions caused and maintained artificial inflation in the price of LG.Philips ADSs throughout the Class Period and until the truth was slowly revealed to the market. As defendants' prior misrepresentations and omissions were disclosed and became apparent

- 44 -

to the market in pieces throughout the Class Period, the price of LG.Philips securities fell precipitously as the prior artificial inflation came out of the Company's ADS price. Due to their Class Period purchases of LG.Philips securities during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

92.     Defendants' false and misleading statements and omissions had the intended effect and caused LG.Philips securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $26.60 per ADS on June 7, 2005, before the first series of truth-revealing disclosures came to light.

93.     In early 2006 and continuing through late Spring 2006, defendants began to curtail their price-fixing activities and reduce the prices for LCDs, after they learned of the fate of certain Samsung executives who were jailed and fined in connection with the price-fixing scheme in the DRAM industry. At the same time, rumors about the reasons for the sudden "weak pricing" in the LCD marketplace, *i.e.*, collusive price-fixing, began circulating throughout the markets, negatively impacting the Company's share price. In a matter of weeks, the Company's shares declined from $22 per share to $15 per share, a decline of 31.8%. During this time, on June 12, 2006, LG.Philips announced that it was revising its Q2 2006 projections, since it could no longer sustain its earnings without its collusive efforts, which was then later followed by an announcement of its ***first loss in 10 quarters.***

94.     On October 10, 2006, prior to the market opening, LG.Philips issued a press release reporting an 86% loss for Q3 2006. In response to this news, the price of LG.Philips ADSs dropped $0.50 per ADS at the opening bell. It fell another $0.63 during the day to close at $15.12, down a total of $1.13 per share or 6.95%, from its closing price of $16.25 on October 9, 2006, on particularly heavy volume of more than 3.4 million shares traded.

95.     While the foregoing disclosure removed a portion of the artificial inflation in the Company's ADSs price – as it began to reflect LG.Philips' true earnings potential, without the benefit of (or a substantially reduced benefit from) artificial prices resulting from defendants' fraudulent price-fixing schemed – it only marked the beginning of a series of partial disclosures of the true force behind the Company's inflated Class Period financial results.

96.     Less than two months later, on December 8, 2006, rumors spread into the market of a KFTC investigation of LG.Philips' participation in the alleged anticompetitive price fixing scheme. The Company, in response, said nothing.

97.     The market, however, negatively interpreted these rumors for their truth, and the price of LG.Philips ADSs fell $0.31 per share, or approximately 2.04%, from its closing price of $15.23 on December 7, 2006 to close at $14.92 on December 8, 2006, on heavy volume of 1,092,900 shares traded.

98.     By the very next trading day, LG.Philips could no longer remain silent about its involvement in the alleged anticompetitive price-fixing scheme.  On December 11, 2006, before the market opened, LG.Philips disclosed that the KFTC, the Department of Justice and the Japan Fair Trade Commission ("JFTC") were all conducting investigations of the Company's participation in illegal price-fixing of LCD panels.  Specifically, LG.Philips disclosed that the KFTC had visited the Company's offices in Seoul, Korea, the Department of Justice had issued a subpoena to the Company's San Jose, California office, and the JFTC had issued a notice to the Company's office in Tokyo, Japan.

99.     In response to this adverse – and previously undisclosed – news, the price of LG.Philips securities fell another 2.35% from its closing price of $14.92 on December 8, 2006, to close at $14.57 on December 11, 2006, on heavy volume of 1,107,800 shares traded.  The market

continued to absorb this news and shares fell another 3.5% over the next trading day, to close at $14.06 per share on December 12, 2006, on heavy volume of 2,843,100 shares traded.

100.   Between the close of business on December 7, 2006 and December 12, 2006, LG.Philips ADSs lost a total of $1.17 per share, or 7.68%, thus removing all the artificial inflation from the price of the Company's ADSs and damaging Class members.  The closing price on December 12, 2006 of $14.06 per ADS also represented a dramatic 47% decline from the Class Period high of $26.60 reached on June 7, 2005.

<b>Additional Scienter Allegations</b>

101.   As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding LG.Philips, their control over, and/or receipt and/or modification of LG.Philips' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning LG.Philips, participated in the fraudulent scheme alleged herein.

102.   Defendants were further motivated to engage in the conduct herein in order to successfully consummate its IPO and raise $1 billion, complete its Secondary Offering and raise $1.4 billion, and obtain an additional $500 million in other securities offerings ($200 million in USD denomination floating rate notes and $300 million in KRW denomination fixed rate bonds) on terms

otherwise unobtainable ***but for*** defendants' fraudulent conduct, including the use of false and misleading prospectuses for the IPO and Secondary Offering.

**No Safe Harbor**

103.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of LG.Philips who knew that those statements were false when made.

**Applicability of Presumption of Reliance:**
**Fraud on the Market**

104.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's securities traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- 48 -

(e)    Lead Plaintiffs and other members of the Class purchased LG.Philips securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

105.    The market for LG.Philips ADSs was open, well-developed and efficient at all relevant times.  LG.Philips ADSs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market.  As a regulated issuer, LG.Philips filed periodic public reports with the SEC and the NYSE.  Defendants regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.  LG.Philips was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

106.    As alleged herein, the change in the price of LG.Philips ADSs – compared to the changes in the peer group and NYSE – in response to the release of unexpected material positive and negative information about the Company, shows there was a cause and effect relationship between the public release of the unexpected information about LG.Philips and the price movement in the Company's ADSs.  The average daily trading volume of LG.Philips ADSs during the Class Period was approximately 706,000 shares.  Numerous analysts followed LG.Philips, attended the Company's conference calls and issued reports on the Company throughout the Class Period.  The Company was eligible to – and did – register securities on Form S-3 during the Class Period.

107.    As a result of the foregoing, the market for LG.Philips ADSs promptly digested current information regarding the Company from all publicly available sources and reflected such information in the Company's share price.  Under these circumstances, all purchasers of LG.Philips ADSs during the Class Period suffered similar injury through their purchase of LG.Philips ADSs at artificially inflated prices and the subsequent revelations concerning declines in price, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

108.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased LG.Philips publicly traded securities on the open market during the Class Period (the "Class").  Excluded from the Class are defendants, the directors and officers of LG.Philips, members of their families, and their legal representatives, heirs, successors or assigns, and any entity in which any defendants have or had a controlling interest.

109.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, LG.Philips ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  During the Class Period, there were hundreds of millions of outstanding shares owned by hundreds, if not thousands, of persons.  Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Record owners and other members of the Class may be identified from records maintained by LG.Philips or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

110.    There is a well-defined community of interest in the questions of law and fact involved in this case and predominate over any questions solely affecting individual members of the Class.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether defendants violated the Exchange Act;

(b)    Whether defendants engaged in a fraudulent scheme;

(c)    Whether defendants omitted and/or misrepresented material facts;

(d)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(f)    Whether the price of LG.Philips ADSs was artificially inflated during the Class Period;

(g)    Whether defendants' fraudulent scheme, misrepresentations and omissions caused Class members to suffer economic losses, *i.e.* damages; and

(h)    The extent of damage sustained by Class members and the appropriate measure of damages.

111.    Lead Plaintiffs' claims are typical of those claims of the members of the Class because Lead Plaintiffs and the members of the Class purchased LG.Philips ADSs during the Class Period and sustained damages as a result of defendants' conduct alleged herein.

112.    Lead Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel who is experienced in class action securities litigation.  Lead Plaintiffs have no interests which conflict with those of the Class.

- 51 -

113.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  A class action will achieve economies of time, effort and expense and provide uniformity of decision to the similarly situated members of the Class without sacrificing procedural fairness or bringing about other undesirable results.  Class members have not indicated an interest in prosecuting separate actions as none have been filed.  The number of Class members and the relatively small amounts at stake for individual Class members make separate suits impracticable.  No difficulties are likely to be encountered in the management of this action as a class action.

114.   In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy because the questions of law and fact common to the Class predominate over any questions affecting only individual Class members.  Although individual Class members have suffered disparate damages, the fraudulent scheme and the misrepresentations and omissions causing damages are common to all Class members.  Further, there are no individual issues of reliance that could make this action unsuited for treatment as a class action because all Class members relied on the integrity of the market and are entitled to the fraud-on-the-market presumption of reliance.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

115.   Lead Plaintiffs incorporate ¶¶1-114 by reference.

116.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading.

117.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of LG.Philips publicly traded securities during the Class Period.

118.     Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LG.Philips publicly traded securities. Lead Plaintiffs and the Class would not have purchased LG.Philips publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

119.     As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of LG.Philips publicly traded securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

120.     Lead Plaintiffs incorporate ¶¶1-119 by reference.

121.     The executive officers of LG.Philips prepared, or were responsible for preparing, the Company's press releases and SEC filings.  The Individual Defendants controlled other employees

of LG.Philips.  LG.Philips controlled the Individual Defendants and each of its officers, executives and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

### PRAYER

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action;

B.    Awarding damages, including interest;

C.    Awarding reasonable costs, including attorneys' fees; and

D.    Such equitable/injunctive or other relief as the Court may deem proper.

### JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  August 7, 2008                    COUGHLIN STOIA GELLER
                                             RUDMAN & ROBBINS LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD


                                          _____
                                               DAVID A. ROSENFELD

                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)

- 54 -

SCHIFFRIN BARROWAY TOPAZ
  & KESSLER, LLP
KATHARINE M. RYAN
CHRISTOPHER L. NELSON
MICHELLE M. NEWCOMER
280 King of Prussia Road
Radnor, PA  19087
Telephone:  610/667-7706
610/667-7056 (fax)

*Lead Counsel for Plaintiffs*

LAW OFFICES OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone:  412/391-5164
412/471-1033 (fax)

*Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on August 7, 2008, I caused a true and correct copy of the attached:

Consolidated Amended Complaint for Violations of the Federal Securities Laws to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail on Mitchell A. Lowenthal of Cleary Gottlieb Steen & Hamilton, LLP, One Liberty Plaza, New York, NY 10006.

*/s/ David A. Rosenfeld*
David A. Rosenfeld
